IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SELWYN BROWN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Civil Action No. 05-347 |
| | ) | Judge David S. Cercone/ |
| D.O.C. PA; J. BEARD; D. WILLIAMSON; | ) | Magistrate Judge Amy Reynolds Hay |
| S. BURKS; A.W. RUSS; E. KLEM; K.G. | ) | |
| CHMIELEWSKI; T. HORNUNG; J. | ) | |
| CORBACIO; R. NOVOTNEY; P. | ) | |
| RAMER; CAPT. V. MOONEY; CAPT. | ) | |
| CLARK; LT. GAVIN; L. FLINO; T.D. | ) | |
| JACKSON; M. BRUNO; CAPT. | ) | |
| MUCCINO; LT. HAYWOOD; LT. | ) | |
| MEIGHEN; SGT. MITCHELL, | ) | |
| | ) | |
| Defendants | ) | Re: Dkt. [64] |

AMENDED REPORT AND RECOMMENDATION

I.    RECOMMENDATION

It is recommended that defendants' motion for summary judgment be granted.

II.    REPORT

Plaintiff, Selwyn Brown ("Plaintiff"), a state prisoner, has filed a civil rights action, suing

employees of the Pennsylvania Department of Corrections ("DOC"). He alleges that he is a

member of the Nation of Gods and Earths, also referred to as the "Five Percenters," which is akin

to a religion. The Court will utilize the term "Five Percenters." Plaintiff claims that the

Defendants have determined that he is a core leader of the Five Percenters, which in their expert

opinion is a prison gang, and that, as a core leader, Plaintiff has several times ordered other Five

Percenters to attack inmates. The Defendants have concluded that Plaintiff, as a core leader,

presents a security threat and have placed him in administrative custody, which is a higher

security housing condition.  Prisoners in administrative custody are kept in their cell most of the

day and are denied privileges that are accorded to inmates in general population.  The essential

thrust of Plaintiff's complaint is that his treatment is a violation of the First Amendment free

exercise clause.  He also complains that confiscation of his Five Percenters literature that was

mailed to him violates his rights under the Religious Land Use and Institutionalized Persons Act

("RLUIPA").

### Relevant Procedural History

After being granted pauper status, Plaintiff filed a civil rights complaint,  Dkt. [3],

naming a whole host of DOC employees in the caption of the case but failing to make any

specific allegations in the body of the complaint against several of those named in the caption.

The complaint alleged  that while housed in SCI-Mahanoy, Plaintiff was removed from general

population and placed in administrative custody and that the reason given  for the move was that

Plaintiff was a security threat.  Roughly seven months later, i.e., in May 2004, Plaintiff was

transferred to SCI-Greene, where he is currently confined and where he continues to be held in

administrative custody.  Plaintiff contends that he was originally placed in administrative custody

solely because of his beliefs in the Five Percenters.

Plaintiff also complains that in August 2004, Defendant Sgt. Mitchell, who apparently

was the housing sergeant on the unit Plaintiff was housed in, refused to deliver to the Plaintiff a

Five Percenters newspaper that had been mailed to him and which the mailroom did not

confiscate, thereby implicitly approving Plaintiff's receipt of the Fiver Percenters newspaper.

Defendant Mitchell is alleged to have intercepted the Five Percenters newspaper and forwarded it

to the security office.

Plaintiff affirmatively alleges that he filed grievances to the highest level of administrative review, and that he has exhausted all of his available administrative remedies.

Plaintiff claims that his placement and continued confinement in Administrative Custody, absent any real evidence that he was a security threat, violates the due process clause and equal protection clause.  Dkt. [3] at 2, ¶ 13.  He further claims that Defendant Mooney placed Plaintiff in administrative custody in retaliation for practicing his belief, which would constitute a First Amendment violation.  Id. at 2-3, ¶ 14.  Plaintiff also complains that the confiscation of his Five Percenters newspaper violated his First Amendment right to receive mail and his equal protection rights.  Dkt. [3] at 3, ¶ 15.

After Defendants filed a motion to dismiss, Dkt. [27],  that was denied, Dkt. Nos. [33] & [34], Plaintiff filed an amended complaint.  Dkt. [35].   In that amended complaint, Plaintiff added a claim pursuant to RLUIPA that "Defendants [sic]  Mooney['s] actions of locking the Plaintiff down in solitary confinement [i.e., Administrative Custody] for the contents and practice of his belief violated the Religious Land Use and Institutionalized Persons Act."  Dkt. [35] at 3, ¶ 4.   Plaintiff also contended that all of the Defendants were acting under a code of silence or a conspiracy to commit the constitutional violations complained of herein.  Id., at 3, ¶ 6.   The parties appear to treat this amended complaint as merely supplementing the original complaint and not as supplanting the original complaint.  Hence, the operative complaint in this action will be both Dkt. [3] and Dkt. [35].  Defendants filed a motion for summary judgment, Dkt. [64], accompanied by evidentiary materials, including affidavits, and a brief in support, Dkt. [65].  After being granted an extension of time, Dkt. [78], in which to file his response in opposition, Plaintiff filed his brief in opposition, Dkt.[80], with evidentiary materials attached.   Plaintiff also

filed an affidavit from Charles Banks.  Dkt. [85].   Plaintiff also filed a statement of disputed

facts.  Dkt. [89].

Defendants filed a supplement to their summary judgment motion, Dkt. [95], in which

they address the significance of the Court of Appeals intervening decision in Washington v.

Klem __ F.3d, __, 2007 WL 2199190 (3d Cir. Aug. 2, 2007), which defined the statutory term of

"substantial burden" as found in RLUIPA.

Plaintiff also filed a supplemental declaration in opposition to the Defendants' motion for

summary judgment,  Dkt. [96], to which he appended evidentiary materials in the form of

Program Review Committee ("PRC") decisions regarding his placement in Administrative

Custody and periodic reviews by the PRC of his continuation on that status.  Finally, Plaintiff

filed a brief in opposition to the Defendants' supplement to their summary judgment motion, in

which Plaintiff attempts to address the significance of Washington v. Klem to the case at hand.

### *Legal Standard*

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving

party, "the pleadings, depositions, answers to interrogatories and admissions on file, together

with the affidavits, if any, show that there is no genuine issue of material fact and the movant is

entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(C).  Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any

element essential to that party's case, and for which that party will bear the burden of proof at

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing

that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

### Discussion

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 in attempting to vindicate his constitutional rights, and pursuant to RLUIPA as well.  The Court will address the Section 1983 claims first and then address the RLUIPA claims.

### Section 1983

Regarding Section 1983, in order to

> make out a claim under Section 1983, a plaintiff must demonstrate that the conduct of which he is complaining has been committed under color of state or territorial law and that it operated to deny him a right or rights secured by the Constitution and laws of the United States. The plaintiff must also establish that it was the acts of the defendant which caused the constitutional deprivation.

Mosley v. Yaletsko, 275 F.Supp.2d 608, 613 (E.D.Pa. 2003)(citations omitted).

### 1.    Due Process Claims

Plaintiff claims that the following actions deprived him of due process: (1) his placement and continued confinement in Administrative Custody and (2) the confiscation of his Five Percenters newspaper.  Plaintiff does not make clear whether he is making a substantive due process claim or a procedural due process claim or both.  Given the liberality that courts accord a

pro se Plaintiff, the court will assume he is making both claims and address the procedural due process claim first.

A procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause, of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements. Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

For present purposes, the Court will assume without deciding that Plaintiff has a protected liberty interest arising from State law in not being held in Administrative custody for as long as he has been. Here, Plaintiff was placed in administrative custody on October 27, 2003, and apparently has remained there since then, although his own submissions show that for a period of at least roughly 150 days or four months, Plaintiff was placed in disciplinary custody for having been found guilty of serious disciplinary rule infractions. Dkt. [96] at 14. Evidence further shows that as to both of the disciplinary charges, Plaintiff pleaded guilty. Dkt. [91-2] at 23 & 26. Hence, Plaintiff's time in Administrative Custody, which he alleges is due merely to his belief in the Five Percenters, amounted to roughly 3½ years (i.e., October 2003 to present = roughly 4 years, minus the 150 days in disciplinary custody = 3 ½ years). Even assuming that this length of time in Administrative Custody implicates a state created liberty interest, the record reveals that Plaintiff has received all of the process to which he is entitled.

On October 27, 2003, Plaintiff received a Notice of Confinement informing him that he was being confined in Administrative Custody pursuant to DC-ADM 802,VI, A. I. f., pending an investigation by the Security Office. Dkt. [91-2] at 18. On November 13, 2003, Plaintiff

received a notice from the PRC indicating that it would hold a hearing to determine "if there is a need for your continued AC status based upon information which has been gathered indicating your involvement in an assault on another inmate." Dkt. [91-2] at 20. The PRC did hold a hearing and Plaintiff was notified that he would be continued in Administrative Custody since "his presence in general population would constitute a threat to himself, others, or the safety and security of the institution." Dkt. [91-2] at 19. On December 11, 2003, the PRC again reviewed Plaintiff's AC status and decided to continue Plaintiff in AC. Dkt. [91-2] at 21. On March 4, 2004, Plaintiff had another review before the PRC and its decision was to continue Plaintiff in AC status. He received a fourth review on May 13, 2004. Dkt. [91-2] at 30. On May 18, 2004, Plaintiff was transferred from SCI-Mahanoy to SCI -Greene and he was continued on AC status at SCI-Greene. Dkt. [91-2] at 31. Plaintiff received another 90 day review on May 20, 2004. Dkt. [91-2] at 32. See also id. at 37. Plaintiff's next review was conducted on September 16, 2004, and the PRC requested a security review. Dkt. [91-2] at 39. Plaintiff received another PRC review on December 7, 2004, id. at 41, and another on August 18, 2005, id., at 45, and another on November 10, 2005, id., at 44, and  another on February 2, 2006, id., at 43, and another on April 27, 2006, id., at 42, and another on July 20, 2006, id., at 41. These periodic reviews and the availability of appeals therefrom afford Plaintiff all of the process to which he is entitled under the Constitution. Thus, even if he were being deprived of a liberty interest, he is

not being deprived of that liberty interest without due process.[1]  See e.g., Shoats v. Horn, 213 F.3d 140 (3d Cir. 2000).

In Shoats, the prisoner therein had been kept in Administrative Custody for eight years and the court held that the DOC procedures for reviewing an inmate's placement in AC was sufficient to satisfy the notice and opportunity to be heard such that placement in the AC did not deprive the prisoner of a liberty interest without the due process required by the constitution. The Shoats Court noted that

> The process provided by the Pennsylvania DOC to an inmate confined in administrative custody is as follows.  A hearing is conducted by the PRC, in which the rationale for the administrative custody placement is read and explained to the inmate.  See A84.  The inmate is permitted to respond to the rationale for administrative custody placement either orally or in writing.  Id.  A Committee member then drafts a summary of the inmate's statements.  Id.  A written summary of the entire hearing is then prepared, which includes the reasons relied upon by the PRC to reach its decision, and a copy of this summary is given to the inmate. Id.

> An inmate may appeal the PRC's decision to the Superintendent in writing within two days of the completion of the hearing, and the decision of the Superintendent must be forwarded to the inmate within ten days of the receipt of the appeal.  See A85.  The inmate's right to appeal terminates when he or she is released from administrative custody.  Id.

> At least once every thirty days, those inmates assigned to administrative custody have the right to be personally interviewed by the PRC.  Id.  For those

---

[1]      Although not clear, Plaintiff may be claiming a denial of procedural due process in his transfer from SCI-Mahanoy to SCI-Greene.  However, such does not state a procedural due process claim. Plaintiff's transfer from one institution to another institution does not involve any liberty interest stemming either directly from the Constitution or from state law.  The due process clause of the Fourteenth Amendment does not itself create such a liberty interest.  Meachum v. Fano, 427 U.S. 215, 224 - 25 (1976).  Nor does the law of the Commonwealth create such a liberty interest.  Nichelson v. Redwine, No. Civ. A. 99-1769, 2000 WL 1599246, at *2  (E.D. Pa. Oct. 26, 2000)(post Sandin case holding that "[n]either the Due Process Clause nor the laws of Pennsylvania give a convict a protected liberty interest in remaining in any particular housing status, in any particular state prison, or in any particular housing area.").  See also 37 Pa.Code § 93.11(a)("No inmate shall have a right to be housed in a particular institution or in a particular area within an institution.").

inmates not released from administrative custody following the thirty-day review, the reasons for the PRC's decision are forwarded to the Superintendent for his or her review.  Id.  If the Superintendent agrees that the rationale for holding an inmate in administrative custody is reasonable, he or she notifies the inmate accordingly.  Id.  If, however, the Superintendent believes the inmate should be released to the general population, he or she will so order it.  Id.

After an inmate is confined for ninety days in administrative custody, the Superintendent must complete a formal report to the Regional Deputy Commissioner, who then reviews the recommendation of the institution to determine if any further action is necessary.  Id.  Further action may include release to the general population, transfer to another facility or program, or continuation in administrative custody.  Id.  In light of the standard set forth by the Supreme Court in Hewitt, we conclude that the Pennsylvania procedures clearly comply with due process requirements.

The record reflects that the procedures called for did in fact occur. Specific program review committee progress reports are included in the record, which reflect Shoats' choice to appear at some, but not all, of his PRC reviews.  The reports reflect that Shoats raised and discussed various issues at these committee sessions, including his desire for library time, complaints about the commissary and medical treatment, visitation rights, and other general matters.  In many instances, Shoats complained about the denial of his release into the general population, and he was advised of the prison's reasons for denying his release.

Shoats, 213 F.3d at 145-46.  As in Shoats, so also here the record reflects that Plaintiff received all of the process to which he was entitled.  While Plaintiff complains that there were inadequacies in the notices that he received, repeatedly complaining that the notices were based on insufficient evidence, the court concludes that the evidence of reports that Plaintiff was involved in ordering attacks on other inmates, which the DOC officials apparently credited over Plaintiff's denials, are more than sufficient to permit the Defendants to conclude that Plaintiff is a threat to the security of the institution.

Moreover, Plaintiff's complaints that the evidence or notices failed to meet various standards set forth in the DOC guidelines, Dkt. [96], fails to state a claim of procedural due

9

process.  First, Plaintiff's complaints of mere violations of state rules and procedures is not cognizable in a section 1983 suit.  Gramenos v. Jewel Companies, Inc., 797 F.2d 432, 434 (7th Cir. 1986)("In a suit under § 1983 the plaintiff must show a violation of the Constitution or laws of the United States, not just a violation of state law. The two are not the same.").  Secondly, simply because the state mandates that certain procedures be complied with does not mean thereby that those procedures are of constitutional significance.  Hence, the failure to comply with them, does not deprive Plaintiff any constitutional due process.  As the Court of Appeals for the Third Circuit explained:

> The fact that Pennsylvania regulations provide for hearings after transfer to administrative custody is not relevant to a determination of whether federal procedural due process is required.  See Hewitt v. Helms, 459 U.S. 460, 470(1983)(The mere fact that Pennsylvania has created a careful procedural structure to regulate the use of administrative segregation does not indicate the existence of a protected liberty interest.).  The process afforded by state law is not relevant in determining whether there is a state created right that triggers due process protection.  Olim v. Wakinekona, 461 U.S. 238 (1983). ("The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice, the State does not create an independent substantive right.")

Griffin v. Vaughn, 112 F.3d 703, 709 n.3 (3d Cir. 1997).  Accordingly, there is no genuine factual dispute over whether Plaintiff's placement and continuation in AC constituted a procedural due process violation.

As to Plaintiff's claim that the confiscation of his Five Percenters newspapers/publications constituted a deprivation of his property without due process, Plaintiff fails to state a claim as a matter of law.  Plaintiff asserts that Defendant Mitchell prevented Plaintiff from receiving such publications and that Defendant Mitchell did so in violation of DOC policy.  Dkt. [80] at 11, ¶5.  Because state law provides post deprivation remedies in the

form of the grievance procedure and state tort law claim of conversion, Plaintiff cannot state a

procedural due process claim as a matter of law.  Austin v. Lehman, 893 F. Supp. 448, 454 (E.D.

Pa. 1995) (both inmate grievance procedure and state tort law action constituted adequate

post-deprivation remedies); Robinson v. Ridge, 996 F.Supp. 447, 450 n. 4 (E.D. Pa. 1997)(DOC

grievance procedure adequate post deprivation procedure and hence no procedural due process

claim was able to be made), aff'd, 175 F.3d 1011 (3d Cir. 1999)(Table); Rogers v. Mrs. Brown,

No. Civ. A. 95-7867, 1996 WL 608473, at *2 (E.D. Pa. Oct. 24, 1996) (both DOC grievance

procedure and tort suit in state court may provide adequate post deprivation remedies for

deprivation of legal papers).  Nor does Defendant Mitchell's alleged failure to comply with state

policy deny to Plaintiff any state created liberty interest.  Phillips v. Norris, 320 F.3d 844, 847

(8th Cir. 2003) ("there is no federal constitutional liberty interest in having state officers follow

state law or prison officials follow prison regulations.").

Next, the court will take up Plaintiff's substantive due process claim.  Essentially,

Plaintiff's argument boils down to the claim that the Defendants' assessment that he is a core

member of the Five Percenters, which Defendants deem to constitute a prison gang, and their

conclusion that as a core member Plaintiff has ordered other Five Percenters to attack prisoners,

is simply erroneous and not based on any credible evidence.  Plaintiff's argument then asserts

from this premise (i.e., that the Defendants are wrong in their assessment of his being a core

member and a security threat), that their decision to place him in Administrative Custody violates

his constitutional right to substantive due process.

Plaintiff is simply wrong. Substantive due process "is an area of the law famous for its

controversy, and not known for its simplicity."  Woodwind Estates Ltd. v. Gretkowski, 205 F.3d

11

118, 122 (3d Cir. 2000).  In contrast to procedural due process's focus on procedures, substantive

due process prohibits certain government actions irrespective of the procedures which attend

those actions.  Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000)

("The substantive component of the Due Process Clause limits what governments may do

regardless of the fairness of procedures that it employs, and covers government conduct in both

legislative and executive capacities."), abrogated on other grounds as recognized in, United

Artists Theatre Circuit, Inc. v. Township of Warrington, PA, 316 F.3d 392 (3d Cir. 2003).

Whereas procedural due process concerns deprivations of liberty interests and assures that such

deprivations are not accomplished unless attended by certain procedures, substantive due process

does not require a liberty interest in order to be violated.  Block v. Potter, 631 F.2d 233, 236 (3d

Cir. 1980)(holding that denial of parole based on race may state a claim for violation of

substantive due process even though there is no liberty interest in parole);[2] Pittsley v. Warish,

927 F.2d 3, 6 (1st Cir. 1991)(under one theory of substantive due process "it is not required that

the plaintiffs prove a violation of a specific liberty or property interest") (citing, Rochin v.

California, 342 U.S. 165 at 172, 173 (1952)).

The standards for analyzing a substantive due process claim appears to depend upon

whether one is challenging legislative or executive action.  See, e.g., Wagner ex rel.

Wagner-Garay v. Fort Wayne Community Schools, 255 F.Supp.2d 915, 922 (N.D. Ind. 2003)

("However, the appropriate standard for analyzing a substantive due process claim depends on

---

[2]       This court acknowledges that even though "the vitality of *Block* is questionable, it must be
followed until overturned.  See Jubilee v. Horn, No. 97-1755, slip op. at 1 (3d Cir. Mar.26, 1998)
(unpublished per curiam decision) ('[N]ot only do courts of appeals in other circuits disagree with Block,
but more recent decisions by this Court suggest that Block may be obsolete.')."  Rauso v. Vaughn, No.
Civ. 98-6312, 1999 WL 111474, at *1 (E.D. Pa. March 2, 1999).

whether 'legislation or a specific act of a governmental officer is at issue.'")(quoting, Dunn v. Fairfield Community High School Dist. No. 225, 158 F.3d 962, 965 (7th Cir. 1998)).  The DOC is an executive branch agency.  The standard of review for a substantive due process challenge to executive branch action requires that the aggrieved person establish that the executive action shocks the court's conscience.  See, e.g., Hunterson v. DiSabato, 308 F.3d 236, 247 n. 10 (3d Cir. 2002) (wherein the Court of Appeals observed that "we have frequently employed the 'shocks the conscience' standard when considering a claim that an executive action amounted to a substantive due process violation.").

Plaintiff apparently raised the very same complaints about insufficient evidence and the erroneous conclusion that he is a core member and that he constitutes a security threat before the PRC and Superintendent Folino, Dkt. [3] at 2, ¶¶ 9 & 12 (Plaintiff alleged that he exhausted his administrative remedies), that he raises herein.   Hence, the Defendants had before them Plaintiff's contentions as to errors in finding him to be a core member of the Five Percenters, and in finding that he ordered attacks on other inmates, and in finding him to be a threat to the security of the institution.  Accordingly, the Defendants could determine for themselves whether Plaintiff was a core member/leader of the Five Percenters, and whether he ordered attacks on other inmates, and they could decide what weight, if any, to give the reports from DOC security investigators, alleging such about Plaintiff, as well as what weight to give to Plaintiff's denial of those allegations.  Given that the PRC and Defendant Folino and others decided to maintain Plaintiff in administrative custody, they apparently determined that the allegations were true and Plaintiff's denials were not.  Such determinations are completely within the Defendants' discretion and should not be overturned even if this court were to find to the contrary, i.e., that

Plaintiff was not a security threat and did not order attacks on other inmates and was not a leader

of the Five Percenters, because the Defendants are entitled to make their own factual

determinations; and disagreements between, on the one hand, the Defendants' assessment of the

security reports concerning Plaintiff and their assessment of his denials of involvement or

leadership and, on the other hand, this court's or even a jury's assessment of security reports and

Plaintiff's denials, are not a basis for finding a violation of Plaintiff's constitutional right to

substantive due process.  In other words, for purposes of deciding whether Plaintiff is a security

threat, Plaintiff is a security threat unless and until the Defendants determine him not to be, and

even if the Defendants were erroneous in determining that he was a security threat, such an error

does not constitute a substantive due process violation.  <u>Bishop v. Wood</u>, 426 U.S. 341, 350

(1976)("The Due Process Clause of the Fourteenth Amendment is not a guarantee against

incorrect . . . decisions"), <u>overruling on other grounds as recognized in</u>, <u>Whims v. Harbaugh</u>, 139

F.3d 897 (4th  Cir. 1998) (Table, Text in Westlaw); <u>Lowrance v. Achtyl</u>, 20 F.3d 529, 537 (2d

Cir. 1994) (applying rule of <u>Bishop v. Wood</u> in a prisoner case); <u>Palmigiano v. Mullen</u>, 491 F.2d

978, 980 (1st Cir. 1974)("There is no federally-protected right to a particular classification nor

even to an error-free decision by the state authorities. 'The Constitution does not assure

uniformity of decisions or immunity from merely erroneous action, whether by the courts or the

executive agencies of a state.'")(<u>quoting</u> <u>Snowden v. Hughes</u>, 321 U.S. 1, 15 (1944) (Frankfurter,

J., concurring)); <u>Tansy v. Mondragon</u>, 52 F.3d 338 (Table), 1995 WL 216926, at *5 (10th Cir.

1995)("Even assuming that some of the allegations against Mr. Tansy were inaccurate, this does

not establish a factual dispute as to whether he was deprived of substantive due process.") .  That

the Defendants committed a factual error in the course of their determining whether Plaintiff is a

security threat and, thus, worthy of placement in Administrative Custody, (assuming that they did do so erroneously) simply does not shock this court's conscience.  That this is the case should not be surprising.  If it does not offend the constitution that an innocent man is convicted of a crime, and made to suffer imprisonment, and, the Supreme Court has determined that it does not so offend,[3] then *a fortiori*, that a convicted prisoner is "mistakenly" classified as a security threat and made to suffer a greater loss of privileges in comparison to those in the general population, does not, merely because the determination is mistaken, violate the constitution.

Accordingly, Plaintiff has failed to show that there is any material factual dispute with respect to his procedural or substantive due process claims.

### 2.      First Amendment claims

Plaintiff makes two distinct First Amendment claims: (1) Plaintiff's First Amendment right to receive mail is implicated by the denial of his Five Percenters publications (Dkt. [3] at 1); and  (2) Plaintiff is being retaliated against for his religious beliefs by the confiscation of his mail and placement in Administrative Custody.  Id.

The court will first address Plaintiff's retaliation claim. Retaliation for the exercise of a constitutionally protected right is itself a violation of rights secured by the Constitution, which is actionable under section 1983.  White v. Napoleon, 897 F.2d 103, 111 - 112 (3d Cir. 1990); Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997) ("[A]n otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that

---

[3]      See Herrera v. Collins, 506 U.S. 390, 400 (1993)("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief.").  See also id. at 404 ("a claim of 'actual innocence' is not itself a constitutional claim").

it was undertaken in retaliation for his exercise of First Amendment speech.") (citing, Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).

In order to prevail on a retaliation claim, a plaintiff must establish: (1) that he engaged in constitutionally protected activity; (2) that he was subject to adverse actions by a state actor; and (3) the constitutionally protected activity was a substantial motivating factor in the state actor's decision to take adverse action.  Anderson v. Davila, 125 F.3d at 161 (citing Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle). If the plaintiff proves these elements, the burden shifts to the state actor to prove that it would have taken the same action even without the unconstitutional factors. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. at 287.  In the prison context, the state actor may rebut a plaintiff's claim by showing that their actions were motivated by legitimate penological objectives.  Pratt v. Rowland, 65 F.3d 802 (9th Cir. 1995).

It is Plaintiff's burden to prove that the Defendants were motivated by retaliation against Plaintiff.  See Hannon v. Speck, Civ. A. No. 87-3210, 1988 WL 131367, at *4 (E.D.Pa. Dec. 6, 1988) ("In bringing a §1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor ... was as he alleged.") (internal quotes and citation omitted), aff'd, 888 F.2d 1380 (3d Cir. 1989)(Table).   Even if a plaintiff successfully alleges that retaliation was the substantial motivating factor, the plaintiff's claim can be defeated by "demonstrating that the same action would have been taken even in the absence of the protected conduct."  Green v. Philadelphia Housing Authority, 105 F.3d 882, 885 (3d Cir. 1997).

It is on the first and the third prongs that Plaintiff's claim fails.  As to the first prong, Plaintiff has adduced no admissible evidence that the Defendants initially placed him in the AC

16

or thereafter maintained him there because of his religious beliefs. Plaintiff alleges, based upon his mere speculation, that the Defendants retaliated against him by placing Plaintiff in the AC for his religious belief in the Five Percenters.  There is no evidence to support this allegation/speculation.  Woods v. Edwards, 51 F.3d 577, 580-581 (5th Cir.1995) (summary judgment affirmed where inmate offered no evidence other than his personal belief that the alleged retaliatory actions were based on his exercise of his rights).

Even if however, Plaintiff had adduced any evidence to carry his burden to show a prima facie case of retaliation, there is no material factual dispute that the Defendants would have taken the same actions regardless of his religious belief.  In fact, the record shows that Plaintiff was initially placed in Administrative Custody on October 27, 2003, "based upon information which has been gathered indicating your involvement in an assault of another inmate."  Dkt. [91-2] at 20.[4]  The record further shows that Plaintiff was then placed in Disciplinary Custody as a

---

[4]      Plaintiff does contend that on November 4, 2003, Defendant Mooney allegedly stated to Plaintiff "I've been waiting to find a reason to lock your black a[][] down.  Your [sic] not going to teach that 5% sh[]t in this prison.  Your [sic] going to be in the hole so long you are going to need a court order to be released." Dkt. [3] at 2, ¶ 2.  Accepting this statement as true, as we must given the procedural posture of this case, we find it is not sufficient to create a genuine issue of material fact precluding summary judgment.  There is absolutely no evidence that Defendant Mooney was in any way involved in Plaintiff's initial placement in the AC which occurred on October 27, 2003, nearly one week prior to Defendant Mooney's alleged statements.  See, e.g., Dkt. [91-2] at 18, the initial notification of confinement in the AC (nowhere does Defendant Mooney's name appear as participating in the decision to place Plaintiff initially in the AC).  Thereafter, it was the Program Review Committee who decided to keep Plaintiff in the AC status.  Dkt. [91-2] at 19.  Hence, even if we accept that Defendant Mooney made the statement that Plaintiff alleges he did, and even if we assume that such a statement evidences retaliatory animus, Plaintiff cannot show a causal connection between Defendant Mooney's retaliatory animus and the adverse action of either placing Plaintiff in Administrative Custody initially, because there is no evidence that Mooney had any role in that, or of Defendant Mooney's keeping Plaintiff in AC because it was the PRC that made this decision.  Hence, the Defendants have amply shown that they would have taken the same action regardless of Defendant Mooney's words.  Plaintiff, who bears the burden of proof as to causation, Yaletsko, 275 F.Supp.2d at 613, has failed to show a genuine issue of material fact with respect to Defendant Mooney causing Plaintiff a constitutional deprivation.
      As for the mere statements Plaintiff alleges that Defendant Mooney made, such are insufficient
(continued...)

punishment for his breaking the DOC rules on two different occasions.  Dkt. [91-2] at 22 - 23

(first incident resulted in placing Plaintiff on Disciplinary Custody from 12/13/03 to 2/10/04);

Dkt. [91-2] at 24-26 (second incident resulted in him being placed in disciplinary custody from

2/11/04 to 5/10/04).  Hence, it is clear that Plaintiff's deprivation of privileges during this time in

disciplinary custody is clearly not retaliatory as a matter of law.  Vercheres v. Wilkinson, 194

F.3d 1315 (6th Cir. 1999)(Table, Text in Westlaw)("Thus, Vercheres's retaliation claim was

properly dismissed, as the finding that he was guilty of stalking satisfied the defendants' burden

of showing that the guard would have charged him with a violation, even if Vercheres had not

filed a grievance."); Harris-Debardelaben v. Johnson, 121 F.3d 708 (Table), 1997 WL 434357, at

*1 (6th Cir. July 31, 1997); Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994) (being found

guilty of a prison rule violation based on some evidence "essentially checkmates [the] retaliation

claim."), cert. denied, 515 U.S. 1145 (1995); Jackson v. Madery, 158 Fed.Appx. 656, 662 (6th

Cir. 2005) (same).

---

[4](...continued)
as a matter of law to constitute an "adverse action" as is required to state a claim of retaliation.  See, e.g.,
Bartelli v. Lewis, NO. CIV.A. 3:CV-04-0908, 2005 WL 2406048, at *2 (M.D.Pa. Sept. 29, 2005)("we
determine that verbal  threats do not constitute an 'adverse  action' and, therefore, do not fulfill a
requisite element of a retaliation claim").  Moreover, even if in other circumstances, verbal threats could
be considered to constitute an "adverse action", Plaintiff has adduced no evidence that mere verbal
threats under the circumstances of this case constituted an "adverse action."  In order to prove an
"adverse action," a prisoner must prove that "the action 'was sufficient to deter a person of ordinary
firmness from exercising his [constitutional] rights.'"  Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).
Presently, Plaintiff adduced no evidence that the alleged verbal threats would have deterred a reasonable
prisoner from exercising his First Amendment rights.  Indeed, although actually being deterred from
engaging in First Amendment rights is not required to be proven in order to make out a retaliation claim,
the fact that Plaintiff was not deterred provides some evidence that can be considered to show that a
reasonable prisoner of ordinary firmness would not have been deterred by the alleged verbal threats.  Cf.
Bartelli v. Bleich, 2005 WL 2347235, at *3 ("the copiousness of Plaintiff's civil rights lawsuits and
complaints against prison officials belie any assertion that defendant Bleich's alleged threats affected
Plaintiff's exercising his First Amendment Rights.").

After Plaintiff's initial placement in the AC and after his time in disciplinary custody was over, the record amply demonstrates that the Defendants extended Plaintiff's placement in Administrative Custody not because of any religious belief by Plaintiff, but because of his actions that the Defendants believed he took as a core member of a prison gang called the Five Percenters.  Defendants supplied two affidavits.  One from John Kingston, who is the Security Intelligence Captain at SCI-Greene. Captain Kingston swears that Plaintiff is being held in AC due to his leadership role in the Five Percenters "in which his actions in regards to a position of Leadership within this organization have resulted in violence toward other Inmates within the Department of Corrections."  Dkt. [64-2] at 4, ¶2.   Captain Kingston further asserts that "documented incidents involving Inmate Brown and various members of the group identified as 5% links the groups with the formal separation[5]of Brown from intended victims or targets, and other identified members, and/or co-defendants.  These separations reflect incidents which required investigation, and/or intervention to maintain the safety and welfare of Inmates,  Staff . . . ." Id., at 4-5, ¶4. Captain Kingston then goes on to list the various separations and the reasons for those separations.  Id., at 5.  Among the reasons for the separations are that Plaintiff was implicated in ordering  assaults on other inmates.

In addition, the Defendants produced the affidavit of John Moyer, who is the Security Lieutenant at SCI-Graterford.  Lt. Moyer attests that while Plaintiff was housed at SCI-Graterford, Lt. Moyer became aware of Plaintiff and learned that Plaintiff has a "core leadership position in a Philadelphia criminal gang whose members identify themselves and their gang as

---

[5]        A separation,  "as its name suggests, is a document which states that an inmate should be separated from another inmate."  Morton v. Vaughn, No. Civ. 93-6691, 1994 WL 172718 at *5 n. 2 (E.D.Pa. May 4, 1994).

affiliated with the 5% Nation of Islam[.]" Dkt. [64-3] at 3, ¶3.  In addition, Lt. Moyer noted that

the gang's "membership can communicate with each other using a code called the "Supreme

Alphabetics'." Id., at ¶ 4.  Lt. Moyer indicated that evidence in the form of taped conversations

of Plaintiff's outgoing calls from SCI-Graterford between Plaintiff and members of his gang

were conducted partially in code and Plaintiff plotted with the other members of the gang to kill a

victim of Plaintiff's crimes (apparently to prevent her from testifying against him) and also

plotted the escape of Plaintiff from custody while he was leaving from his preliminary hearing on

charges. Id., at ¶ 9.  This evidence is sufficient to establish that the Defendants had legitimate

security concerns about Plaintiff, and were justified in placing Plaintiff initially in the

Administrative Custody and continuing him therein.  This was sufficient to carry the Defendants'

initial summary judgment burden to show that there is an absence of evidence to support

Plaintiff's claim for which he bears the burden, i.e., that Plaintiff's placement and continued

confinement in the AC was not retaliatory.

In opposition, Plaintiff produces so-called "affidavits of truth," Dkt. [80] at 29-32 & at 33

-43, wherein he essentially questions the accounts of the affidavits of Captain Kingston and Lt.

Moyer and alleges that they are not credible.  This is insufficient.  See, e.g., Curl v. International

Business Machines Corp., 517 F.2d 212, 214 (5th Cir. 1975) ("(T)he party opposing summary

judgment must be able to point to some facts which may or will entitle him to judgment, or refute

the proof of the moving party in some material portion, and . . . the opposing party may not

merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve

factually uncontested proof."); Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d

14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on

conclusory statements or on contentions that the affidavits supporting the motion are not

credible").

Plaintiff also adduces much material concerning Five Percenters outside of prison and

their practices and teachings to support his contention that Five Percenters are not a gang but a

legitimate group akin to a religion.  While it may be that there exists a group of individuals

outside of prison called Five Percenters who practice the teachings of the Five Percenters, and

who are not members of a gang or do not engage in gang activity, such evidence does not

disestablish the fact that the Defendants have identified Plaintiff and others as Five Percenters

who have formed a prison gang, of which Plaintiff is a leader.  That there may be some similarity

between what Plaintiff does in prison and his actions or professions of belief done in the name of

the Five Percenters and the beliefs or actions of Five Percenters outside of prison, such does not

prevent the Defendants from concluding Plaintiff is a member of a prison gang nor cause their

conclusion that he is a gang member and to treat him as such to constitute  retaliation for Plaintiff

practicing his religion, which, according to Plaintiff is not really a religion but perhaps more

properly considered a way of life.[6]  See, e.g., Fraise v. Terhune, 283 F.3d 506 (3d Cir.

2002)(wherein the Court of Appeals held that transfer to a special management unit (apparently

akin to Administrative Custody but even more restrictive in terms of requiring renunciation of

affiliation with the Five Percenters)[7] constituted a legitimate means of assuring institutional

security and did not violate Turner v. Safley, 482 U.S. 78 (1987)) .

---

[6]     Dkt. [80] at 52 ("we have been misdefined as a religion, cult, offshoot, gang, group and
organization.  We are none of those things.").

[7]     See, e.g., Fraise, 283 F.3d at 520  ("the Policy [at issue in Fraise ] requires core members
assigned to the STGMU to renounce 'affiliation' with their STG [i.e., "Security Threat Group" which, in
Fraise was the Five Percenters] as a condition of returning to the general inmate population.").

Based upon the evidence recounted above concerning the reasons Defendants initially placed Plaintiff in the Administrative Custody and have maintained him there, this court finds that such evidence is similar to the evidence adduced in <u>Fraise v. Terhune</u>, and, as in <u>Fraise</u>, we find that the evidence amply satisfies the Defendants' initial summary judgment burden to show that no genuine factual issue exists concerning whether the <u>Turner v. Safley</u> test[8] has been met. In other words, the Defendants' evidence establishes that the Defendants' actions did not violate Plaintiff's First Amendment rights of free exercise of his religion because their actions are reasonably related to a legitimate penological interest in furthering security.

Nor does the evidence that Plaintiff adduces create a genuine issue of material fact as to whether keeping him in Administrative Custody rationally furthers the legitimate penal interest in security for at least two independent reasons. First, the question under <u>Turner</u> is not whether the Defendants correctly deemed Plaintiff a security threat (and Plaintiff contends that they did not), and consequently, properly placed him in Administrative Custody but whether they rationally did

---

[8]     In <u>Turner</u>, the Court listed four factors governing the review of prison regulations: (i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities. <u>Turner</u>, 482 U.S. at 89-90. The burden is upon the prisoner to show that a challenged prison regulation is unreasonable. <u>Covino v. Patrissi</u>, 967 F.2d 73, 79 (2d Cir. 1992). Indeed, "Plaintiff bears the burden of establishing each prong of the [<u>Turner</u>] test." <u>Prison Legal News v. Cheshire</u>, 2006 WL 1868307, at *5 (D.Utah June 30, 2006). The <u>Turner</u> test applies not only to officially promulgated prison rules or policies but also to any actions taken by prison officials that implicate prisoners' constitutional rights. <u>Frazier v. Dubois</u>, 922 F.2d 560, 562 (10th Cir. 1990)("Although <u>Turner</u> addresses prison rules and regulations, we see no reason why the <u>Turner</u> principle should not apply to other prison actions, such as the transfer here."); <u>Jackson v. Cain</u>, 864 F.2d 1235, 1248 (5th Cir. 1989)("While we deal here with an action rather than a regulation, the same [<u>Turner</u>] standard is applicable to determine if the prison authorities' response to Jackson's writing is constitutionally permitted.").

so.  In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174

F.3d 464, 470 (4th Cir. 1999)("The question is not whether Moore's conclusion was indisputably

correct, but whether his conclusion was rational and therefore entitled to deference.  See Jones

[v. Prisoners' Labor Union], 433 U.S. [119] at 127-28 (1977).  Confronted with multiple reports

of an identifiable group whose members not only threatened but had actually committed serious,

violent acts in the SCDC system and elsewhere, Moore's decision to designate the Five

Percenters as an STG was manifestly a rational action.").  The evidence Defendants had before

them, and which they credited, that caused them to deem Plaintiff a security threat more than

rationally justified deeming him to be a security threat and placing Plaintiff in Administrative

Custody as a means of neutralizing that threat.

        Secondly, Plaintiff has completely failed to adduce, as is his burden, any evidence as to

the third Turner prong.  In other words, Plaintiff has completely failed to adduce any evidence

that there is an easy alternative to his placement in the AC that similarly furthers the security

interest accomplished by his placement therein.   The rule is that "[t]he burden is on the prisoner

challenging the regulation, not on the prison officials, to show that there are obvious, easy

alternatives to the regulation."  Mauro v. Arpaio, 188 F.3d 1054, 1062 (9th Cir. 1999), cert.

denied, 529 U.S. 1018 (2000).  See also Turner, 482 U.S. at 91 ("if an inmate claimant can point

to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid

penological interests, a court may consider that as evidence that the regulation does not satisfy

the reasonable relationship standard."); Casey v. Lewis, 4 F.3d 1516, 1523 (9th Cir. 1993) ("It is

incumbent upon the prisoners to point to an alternative that accommodates their rights at de

minimis cost to security interests.").  Having failed to adduce any evidence that there are ready

alternatives other than placement in Administrative Custody that would equally serve the interest

of prison security, Plaintiff has failed to show a genuine issue of material fact concerning

whether such placement violates <u>Turner</u>, and hence, violates his First Amendment free exercise

rights.

Nor has Plaintiff adduced evidence that his placement in Administrative Custody

prevents him from engaging in the practice of the Five Percenters or, in other words, Plaintiff

also failed to adduce evidence as to the second <u>Turner</u> prong, i.e.,  whether there were alternative

means of exercising his right to practice the Five Percenters' way of life that remains open to him

even while placed in Administrative Custody.  Accordingly, there is no genuine issue of material

fact whether placing Plaintiff in the AC and maintaining him therein violated his First

Amendment right of free exercise.

Next, we address Plaintiff's complaint that Sergeant Mitchell's confiscation of some Five

Percenters Newspapers that were sent to Plaintiff on one particular date, i.e., August 26, 2004,

Dkt. [35] at 2, ¶ 2, violated his First Amendment right to receive mail.  We note that Plaintiff

does not assert that he never receives his Five Percenters Newspapers.  Nor does the evidence

support such.  <u>See</u>, <u>e.g.</u>, Dkt. [64-2] at 8, ¶ 11 (noting that Five Percenters publications are

subject to review issue by issue by the Institutional Periodical Review committee).  Even if

however, Plaintiff were totally banned from receipt of the publication, the Third Circuit Court of

Appeals has held that such a ban satisfied the <u>Turner</u> analysis based upon evidence very similar

to the evidence provided herein.  <u>Fraise</u>, 283 F.3d at 519 ("While the STG Policy forbids

possession of distinctively Five Percent Nation literature, it is undisputed that the Policy allows

inmates to possess, study, and discuss the Bible and the Koran.  Accordingly, study of the Five

Percent Nation's teachings is only partially restricted.").  Similarly, we find the confiscation of Plaintiff's Five Percenters publications on one date by Defendant Mitchell, who transmitted the publications to the Security Office, Dkt. [3] at 2, ¶8,   because he was apparently concerned that such publications posed a threat, to satisfy the Turner standard as being reasonably related to furthering a legitimate penological interest, namely, security, and there is no material factual dispute as to the reasonableness of such an action because Plaintiff failed to produce any copies of the publication to establish it was not a security threat under Turner, and failed to produce any evidence that Defendant Mitchell did not reasonably believe the publication posed a security threat.

To the extent that Plaintiff complains that Sergeant Mitchell's actions violated his rights because Sergeant Mitchell was not a party authorized by the Department of Corrections to intercept Plaintiff's mail, this again states merely a claim of violation of state law and is not cognizable herein.   Gramenos v. Jewel Cos., 797 F.2d at 434.

### 3.        Equal Protection Claim

Plaintiff's equal protection claim amounts to a claim that he is being treated differently because of his belief in the Five Percenters.  In order to succeed in an equal protection claim, a "plaintiff must show that: (1) the complaining person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." Sabatini v. Reinstein, No. 99-2393, 1999 WL 636667, at *2 (E.D. Pa. Aug. 20, 1999). See also  Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995).   The Defendants have

adduced evidence that Plaintiff is a core member of a prison gang, who has ordered assaults on other inmates and poses a threat to the security of the institution.  Plaintiff utterly fails to adduce any evidence that prisoners who are similarly situated to him, (i.e., those deemed by the DOC officials to be a core member of a prison gang, and who have ordered others to attack inmates), are not similarly treated, i.e., that they are not placed in and maintained in administrative custody.  Hedrich v. Board of Regents of University of Wisconsin System, 274 F.3d 1174, 1183 (7th Cir. 2001) ("In order to make out an equal protection claim, however, Hedrich had to present evidence that the defendants treated her differently from others who were similarly situated.").

### *Religious Land Use and Institutionalized Persons Act*

Plaintiff did not mention the RLUIPA in his original complaint.  The first time he mentions RLUIPA was in his amended complaint.   He appears to make only two claims under RLUIPA.  One of the claims is that Defendant "Mooney['s] actions of locking the Plaintiff down in solitary confinement for the contents and practice of belief violated the Religous [sic] Land Use and Institutionalized Persons Act . . ."  Dkt. [35] at 3, ¶ 4.  The second claim is that "[a]ll of the defendants  . . . are under the code of silence and acted pursuant thereto in silencing the constitutional violations complained of herein, as a result of Defendants['] deliberate failure to take remedial action to cease the constitutional violations complained of herein constitutes a violation of the . . . Religous [sic] Land Use and Institutionalized Persons Act."  Id., at 3-5, ¶6.

We will first address the claim that Defendant Mooney's alleged placement of Plaintiff in the AC violated Plaintiff's RLUIPA rights.  As noted previously, there is absolutely no evidence of record that Defendant Mooney was involved in the initial placement of Plaintiff in Administrative Custody, see, e.g., Dkt. [91-2] at 20 (demonstrating that on October 27, 2003,

Plaintiff was placed on AC "based upon information which has been gathered indicating your involvement in an assault of another inmate.").  Nowhere is there mention of Defendant Mooney having any role whatsoever in the decision to initially place Plaintiff in AC.  Nor is there any evidence that thereafter, Defendant Mooney had any role in keeping Plaintiff in Administrative Custody given that it was the PRC which decided, on November 14, 2003 to maintain Plaintiff on AC status.  Dkt. [91-2] at 19.   Hence, Plaintiff fails to adduce any evidence of the factual predicate of his claimed violation of RLUIPA, namely, Plaintiff failed to adduce any evidence that Defendant Mooney had any role in initially placing Plaintiff in AC or thereafter in continuing Plaintiff in Administrative Custody.  Hence, even if we assumed for the sake of argument that Plaintiff's placement or continuation in AC violated Plaintiff's rights under RLUIPA, there is no evidence that Defendant Mooney had any role in causing Plaintiff's placement or continuation therein.  Hence, whether couched in terms of no personal involvement or in terms of causation, Defendant Mooney is entitled to summary judgment.   See O'Malley v. Litscher, 465 F.3d 799, 802 (7th Cir. 2006)(Plaintiff's RLUIPA "case against four of the defendants collapsed immediately because he failed to present any evidence that those defendants were personally involved in the relevant events");  Lighthouse Community Church of God v. City of Southfield,  No. 05-40220,  2007 WL 756647, at *3-*4 (E.D.Mich., March 7, 2007)(finding liability under RLUIPA limited to the injury which was  proximately caused by the violation of RLUIPA).

    Plaintiff's next claim under RLUIPA is that the Defendants' actions in placing Plaintiff in the AC and maintaining him there based solely upon his belief in the tenets of the Five Percenters imposes a substantial burden on his religious exercise.  There is no evidence concerning any of

the Defendants, other than Defendant Mooney, that their actions, in either placing Plaintiff in the AC initially or continuing him therein was based on Plaintiff's religious beliefs as opposed to his actions,[9] which they believed included being a leader of a prison gang who ordered other members to attack inmates and who, consequently posed a security threat that could not be adequately dealt with other than by his placement in Administrative Custody.   Hence, Plaintiff's factual predicate for his RLUIPA claim as to all of the Defendants, other than Mooney, is without support in the record.

As for Defendant Mooney, Plaintiff's evidence is that on November 4, 2003, Defendant Mooney allegedly stated to Plaintiff "I've been waiting to find a reason to lock your black a[][] down.  Your [sic] not going to teach that 5% sh[]t in this prison.  Your [sic] going to be in the hole so long you are going to need a court order to be released." Dkt. [3] at 2, ¶ 2.

 Section 3 of RLUIPA states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that ... interest."  42 U.S.C. § 2000cc-1(a).  If the plaintiff "produces prima facie evidence to support a claim alleging a [RLUIPA] violation ... the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether [the challenged practice or law] substantially burdens the plaintiff's exercise of religion."  Id. § 2000cc-2(b).  For the purposes of RLUIPA, "government" includes

---

[9]        The Defendants argue this point explicitly.  Dkt. [65] at 7 ("It [i.e., placement and continuation in AC] was not a response to the philosophical beliefs he espouses in themselves. . . . His belief did not put him in this situation: his actions did.").

any official of a "State, county, municipality, or other governmental entity created under the authority of a State," as well as any other person "acting under color of State law." Id. § 2000cc-5(4)(A).  The Court of Appeals has defined substantial burden to mean that "a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." Washington v. Klem, __ F.3d __, 2007 WL 2199190, at *5 (3d Cir. Aug. 2, 2007).   For present purposes, we will assume, without deciding, that Plaintiff's profession of belief and membership in the Five Percenters constitutes a "religious exercise" as opposed to an exercise in gang affiliation and that Defendant Mooney's statement consequently implicated a religious exercise as opposed to targeting a gang affiliation.   We find Defendant Mooney's alleged mere verbal threat does not qualify as "substantial pressure" or does not meet the requirement of "forc[ing] [an inmate] to choose between" his religion and a benefit.  See, e.g.,  Rouse v. Caruso, No. 06-CV-10961-DT, 2007 WL 209922, at *6 (E.D.Mich. Jan. 24, 2007)("Mere verbal harassment does not embody the type of coercive pressure which amounts to a substantial burden on religious exercise."), report rejected on other grounds by,  2007 WL 1455919 , at *6 (E.D.Mich.  May 16, 2007);  Madison v. Kilbourne, No. 7:04CV00639, 2006 WL 2037572, at *4 (W.D.Va. July 18, 2006), affirmed in part, vacated in part and remanded,  228 Fed.Appx. 293 (4th Cir. 2007).

Even if we assume for the sake of argument that Defendant Mooney's alleged statement satisfies the substantial burden test, Defendant Mooney would still be entitled to summary

judgment.  This is because, as to the injunctive relief he sought, Plaintiff is no longer in SCI-

Mahanoy, where Defendant Mooney worked and so the claim for equitable relief is moot.  Marrie

v. Nickels, 70 F.Supp.2d 1252, 1259 (D.Kan. 1999) ("Generally, an inmate's transfer to another

prison or release moots his request for declaratory or injunctive relief.") (collecting cases).  See

also Chapdelane v. Keller, No. 95-CV-1126, 1998 WL 357350, at *4 (N.D.N.Y. April 16,

1998)("[i]n this case, plaintiff is no longer incarcerated at Ray Brook and is no longer housed in a

four person cell.  He is not subject to any real or imagined "threats, intimidation, or harassment"

by the Ray Brook staff.  Furthermore, there is no indication that plaintiff's transfer to McKean is

temporary or that he will return to Ray Brook. Consequently, plaintiff's request for an injunction

that restrains Ray Brook officials from violating his civil rights is moot and should be

dismissed.").

As to any claim for money damages against Defendant Mooney, the court finds that

Defendant Mooney is not liable for damages in his individual capacity because RLUIPA does not

authorize money damages against individuals.  Daker v. Ferrero, 475 F.Supp.2d 1325, 1337

(N.D.Ga. 2007);  Gooden v. Crain, 405 F.Supp.2d 714, 723 ("RLUIPA does not contemplate

recovering damages from individuals[.]");  Boles v. Neet, 402 F.Supp.2d 1237, 1241

(D.Colo.2005) (same).  Contra Agrawal v. Briley, 2006 WL 3523750 (N.D. Ill. Dec. 6, 2006);

Marsh v. Granholm, NO. 2:05-cv-134, 2006 WL 2439760, at *10-11, 14 (W.D.Mich. Aug. 22,

2006) (rejecting defendants' argument that they could not be held liable for damages under

RLUIPA in their individual capacities, but ultimately concluding that qualified immunity

shielded defendants from liability); Orafan v. Goord, No. 00CV2022(LEK/RFT), 2003 WL

21972735, at *9 (N.D.N.Y. Aug. 11, 2003) (holding that because the "plain language of the

statute" includes individuals in its definition of "government," RLUIPA "[c]learly ...

contemplates individual liability").   While the District Courts are in disagreement as to the

liability of individuals for damages under RLUIPA and no case from a Court of Appeals deciding

this issue  has been cited to this court nor independently discovered by research, we conclude that

the better reasoned position is found in <u>Daker v. Ferrero</u>, and adopt that reasoning as our own for

finding that RLUIPA does not provide for damages against individuals.

Even if RLUIPA could be construed to permit money damages against individual

defendants in their individual capacities, the court finds that there is no genuine factual dispute

that Defendant Mooney would be entitled to qualified immunity.   A "government official is

entitled to qualified immunity if his conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  <u>Berg v. County of</u>

<u>Allegheny</u>, 219 F.3d 261 (3d Cir. 2000).   At the time of his alleged actions, i.e., November 4,

2003, it would not have been clear that making a verbal threat concerning Five Percenters, which

was widely believed to be synonymous with a prison gang or directing that Plaintiff not teach the

Five Percenters ideology violated clearly established statutory rights under RLUIPA for several

reasons.  First, it would not have been clear that making verbal threats constituted "substantial

burden" in violation fo RLUIPA.  <u>Rouse v. Caruso</u>,  No. 06-CV-10961-DT, 2007 WL 209922

(E.D.Mich. Jan. 24, 2007).  This is especially so given the more widely known and longer

established rule that mere verbal threats do not establish a violation of any constitutional rights.

<u>Pittsley  v. Warish</u>, 927 F.2d 3, 8 (1st Cir. 1991) ("threats causing fear for plaintiff's life [is] not

an infringement of a constitutional right, [and] thus not actionable under § 1983.");  <u>Collins v.</u>

<u>Cundy</u>, 603 F.2d 825, 827 (10th Cir. 1979) (allegation that sheriff laughed at and threatened to

hang a prisoner did not state a constitutional claim under § 1983); <u>Shabazz v. Cole</u>, 69 F.Supp.2d 177, 201 (D. Mass. 1999)("the weight of authority is that verbal threats, even abusive threats with racial epithets, do not, in the context of prison, violate an inmate's constitutional rights. 'Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983.'"); <u>O'Donnell v. Thomas</u>, 826 F.2d 788, 790 (8th Cir. 1987)("alleged verbal threats and abuse by jail officials at the hospital did not rise to the level of a constitutional violation."); <u>Pride v. Holden</u>, 1 F.3d 1244 (Table, text available in Westlaw)(7th Cir. 1993)("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983.").

Second, it would not have been clear to a reasonable official that  banning Plaintiff's teaching of Five Percenters ideology to other inmates and implicitly threatening Plaintiff with Administrative Custody for doing so (which is what Defendant Mooney's statement imported) constituted a violation of RLUIPA when courts had held that: (1) totally banning distinctively Five Percenters literature and requiring Five Percenters to renounce all "affiliation" with Five Percenters was constitutional, as the Court held in <u>Fraise</u>,  and (2) designating the Five Percenters, as a group, to constitute a Security Threat and imposing long term segregation on the members thereof, simply for membership therein, was constitutional as held by the Fourth Circuit court in <u>In re Long Term Administrative Segregation of Inmates Designated as Five Percenters</u>, 174 F.3d 464, 470 (4th Cir. 1999).  This is so notwithstanding the fact that a District Court in New York held, in an unpublished case, that a total ban on all Five Percenters literature and the naming of the Five Percenters as a Security Threat Group violated RLUIPA.  <u>Marria v. Broaddus</u>, 2003 WL 21782633 (S.D.N.Y. July 31, 2003).  However, even that court found that a prohibition

on Five Percenters from congregating and permitting only a one-on-one meeting between a Five Percenters prisoner and an outside non-prisoner adherent to be consistent with RLUIPA.  Marria v. Broaddus, 2004 WL 1724984 (S.D.N.Y. July 30, 2004).  Accordingly, even if damages were available against individuals under RLUIPA, Defendant Mooney would be entitled to summary judgment based upon his qualified immunity.

As to any claims against Defendant Mooney in his official capacity, such a suit is equivalent to a suit against the state and as such is barred by Eleventh Amendment sovereign immunity.  See Madison v. Virginia, 474 F.3d 118, 131-32 (4th Cir.2006) (ruling that states do not waive their sovereign immunity as to damages actions under RLUIPA); Toler v. Leopold, 2007 WL 2238661, at *5 (E.D.Mo. Jul 31, 2007).

### Conspiracy

Finally, Plaintiff alleges in a conclusory fashion that all of the Defendants are in a conspiracy to cover up the unlawful conduct of their fellow Defendants and to deny Plaintiff his rights.  Dkt. [35] at 3-4, ¶ 6.  The court finds that Plaintiff has adduced no evidence, other than speculation, in support of this claim and so summary judgment is appropriate for the Defendants on this claim as well.

III.    CONCLUSION

For the above stated reasons, the Defendants' motion for summary judgment, Dkt. [64], should be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party

opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/  *Amy Reynolds Hay*
United States Magistrate Judge

Dated:  28 August, 2007

cc:     David S. Cercone
        United States District Judge

        Selwyn Brown
        BV-5979
        SCI Greene
        175 Progress Drive
        Waynesburg, PA 15370

        All Counsel of Record via CM-ECF